IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL ACTION NO. H-14-287 |
| v. | § | |
| | § | CIVIL ACTION NO. H-16-1133 |
| ROBERT EARL CARTER. | § | |

## MEMORANDUM OPINION AND ORDER

Defendant Robert Earl Carter, represented by counsel, filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (Docket Entry No. 73). Pending before the Court are the following additional motions:

(1)    The Government's motion and supplemental motion to dismiss (Docket Entries No. 85, 86), to which Defendant filed a response (Docket Entry No. 87);

(2)    The Government's untimely Supplemental Response, Motion for Summary Judgment on the Pleadings and Supplemental Motion for Summary Judgment[1] and Memorandum in Support (the "Supplemental Response") (Docket Entry No. 96), Defendant's Motion to Strike the Supplemental Response as untimely and filed without leave of court (Docket Entry No. 100), and the Government's Motion for Leave to File the Supplemental Response (Docket Entry No. 101);

---

[1]Technically, this portion of the pleading is the Government's second supplemental motion to dismiss, as its initial dispositive motions were a motion and supplemental motion to dismiss.

(3)     The Government's motion for unredacted copies of Defendant's habeas exhibits (Docket Entry No. 96);

(4)     Defendant's motion for *Brady* materials relevant to his claim for prosecutorial misconduct (Docket Entry No. 102), to which the Government filed a response (Docket Entry No. 104); and

(5)     The Government's motion to quash Defendant's subpoena of AUSA Daniel C. Rodriguez for his appearance and testimony as a witness at the evidentiary hearing (Docket Entry No. 103).

## I.  BACKGROUND AND CLAIMS

On September 9, 2014, Defendant executed a written plea agreement and pleaded guilty to making false statements in his 2009 federal income tax return. Following a lengthy sentencing hearing on January 13, 2015, the Court sentenced Defendant to 36 months in prison to be followed by one year of supervised release. Defendant moved to delay entry of judgment and for a new trial/sentencing hearing. The Court denied the motions and entered judgment on March 31, 2015. No appeal was taken.

Defendant raises the following section 2255 claims for a new sentencing hearing:

(1)     Counsel was ineffective at sentencing;

(2)     The Government committed prosecutorial misconduct at sentencing; and

(3)     Cumulative error based on the above two claims.

The Government argues that these claims are without merit.

## II. LEGAL STANDARDS

Generally, there are four grounds upon which a defendant may move to vacate, set aside, or correct his sentence pursuant to section 2255: (1) the imposition of a sentence in violation of the Constitution or the laws of the United States; (2) a lack of jurisdiction of the district court that imposed the sentence; (3) the imposition of a sentence in excess of the maximum authorized by law; and (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996). Section 2255 is an extraordinary measure, and cannot be used for errors that are not constitutional or jurisdictional if those errors could have been raised on direct appeal. *United States v. Stumpf*, 900 F.2d 842, 845 (5th Cir. 1990). If the error is not of constitutional or jurisdictional magnitude, the movant must show the error could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice. *United States v. Smith*, 32 F.3d 194, 196 (5th Cir. 1994).

## III. UNDISPUTED FACTS

The Government presented the following statement of proof at the plea hearing:

On or about April 4, 2011, in the Houston Division of the Southern District of Texas, [Defendant], a resident of the Houston Division of the Southern District of Texas, did willfully make and subscribe a U.S. individual income tax return Form 1040 with attached schedules for the calendar year 2009, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service which said income tax return he did not believe to be true and correct. And that the said return reported on Line 22 of Form 1040, U.S. individual tax return 2009, total income of $276,270, whereas he then and there well knew and believed

he received total income in addition to that heretofore stated, all in violation of Title 26, United States Code, § 7206(1).

This investigation originated when NASA OIG contacted IRS criminal investigation. After receiving a suspected irregularity referral on Enterprise Advisory Services, Inc., herein after EASI, which is located on 6671 Southwest Freeway, Suite 800 Houston, Texas, 77074, which performs as a prime contractor to NASA. The referral alleged consulting irregularities and fraudulent billing.

The evidence in this investigation has established that [Defendant] knowingly defrauded the Internal Revenue Service by diverting income from his company EASI, through his daughter, Deralyn R. Miller Company, Deralyn Miller, Inc., herein after DMI, by committing tax fraud.

The investigation established that [Defendant] used DMI to avoid reported income to the Internal Revenue Service that [he] had received in the form of bonuses. The evidence establishes [Defendant] knowingly and willfully made and subscribed a 2009 individual federal income tax return, which was false as to a material matter, and that he intentionally and willfully underreported his total taxable income. This resulted in his intentional omission of $504,821 in personal taxable income.

[Defendant] is the founder, sole owner, and president and CEO of EASI. Deralyn R. Miller is the president and sole owner of DMI. Investigation established [Defendant] directed that $309,821 in bonus income he received in 2009 for many [*sic*] EASI be converted into a check payable directly to DMI from EASI.

Approximately one month after Miller deposited this EASI check into her business account, she returned approximately 90 percent of the monies directly to [Defendant] using a Cashier's Check made payable to [Defendant]. Bank records reflect Miller retained $23,000, and returned the remaining $286,821 to [Defendant]. Ultimately, neither [Defendant] nor Miller reported any of [Defendant's] $309,821 bonus on their personal income tax returns, nor did DMI as required File Form 1120S, U.S. Corporate Income Tax Return for the 2009 tax year.

Pursuant to U.S. tax law, [Defendant] must pay federal income tax on any personal income earned before he may provide any of the monies to another individual or entity. In this case, the entire $309,821 was personal income to [Defendant] in the form of a bonus from EASI, and therefore monies [he] was required to report in his annual individual federal income tax return.

Investigation further established that EASI issued [Defendant] another bonus check for $195,000 on December 22, 2009, which [he] deposited into his personal savings account. EASI reported this 195,000-dollar payment in their general ledger as executive variable pay. A financial incentive program recognizing the contributions employees made to EASI success [*sic*]. In short, a euphemism used by EASI for bonus back but did not report the income in [his] W-2 Form or issue [him] a Form 1099 miscellaneous income in 2009 as required.

Because EASI recorded this bonus payment as a reimbursement payment to [Defendant] [*sic*]. [Defendant] similarly did not, as required, report this 195,000-dollar personal income bonus on his 2009 individual federal income tax return. Consequently, [Defendant] willfully and intentionally failed to report personal income of $504,821 on his 2009 individual federal tax return in violation of federal law.

(Docket Entry No. 83, pp. 8–12, short exchanges between Court and prosecutor omitted.)

Defendant admitted on the record that the Government's statement of proof was true. *Id.*, pp. 12, 18. In the written plea agreement, Defendant stipulated and agreed that he failed to report personal income of $171,250.00 in 2007, $237,500.00 in 2008, $504,821.00 in 2009, and $195,000.00 in 2010 in his federal individual income tax returns for those tax years, resulting in total unreported income of $1,108,571.00 from 2007 to 2010. *Id.*, p. 13. During allocution, defense counsel informed the Court that Defendant "filed an amended tax return for 2009 and 2010 to address the [$]195,000. The IRS may have issues as to

whether it was done correctly, but there has been an amended tax return filed this year." *Id.*,
p. 23.

## IV. PROSECUTORIAL MISCONDUCT

Defendant contends that the Government engaged in prosecutorial misconduct at
sentencing when it misrepresented to the Court through argument and testimony that
Defendant did not file amended income tax returns in November 2014, that he lied when he
said that he did file them, and that counsel erroneously suggested that the IRS lost them.

It is well established that the prosecution's knowing use of false testimony violates
due process, *Giglio v. United States*, 405 U.S. 150, 154 (1972), and that a prosecutor has a
duty to correct false or misleading testimony when it comes to his attention. *Napue v.
Illinois*, 360 U.S. 264, 269 (1959). It is a defendant's burden to prove that the testimony
was false or misleading, that the prosecution knew it, and that the testimony was material.

The sentencing hearing record in the instant case reflects the following preliminary
remarks by the Government:

> We believe the issue[] that this Court is being asked to address here today [is]
> . . . whether there is sufficient evidence to establish that [Defendant] has not
> fully accepted responsibility.
>
> In this instance, we believe the evidence will show that the reason he should
> not be held to have accepted responsibility is because he has continued to
> engage in criminal conduct. In this case, what we're alleging is that, as a
> result of – he claims that he filed tax returns in November of this year – of last
> year, 2014.

*We've made an attempt to verify that those returns had been filed. We found no record of them.* In an attempt to remove that issue from consideration, we asked the defendant to refile those returns, the exact same returns he claimed he had filed. And that was done on January the 9th of this year with Agent Cory L'Heureux's assistance at the Internal Revenue Services Building.

It was at that time that we discovered that the tax return – three of the tax returns that had been provided to the government as having been filed in November of 2014 were not the tax returns that had actually – were now being represented as being filed.

(Docket Entry No. 54, pp. 12–13, emphasis added.)

Counsel for Defendant responded with the following:

DEFENSE COUNSEL:    Judge, if I may, I believe the basis for – and to give the Court just a real brief kind of factual timeline, [Defendant] was indicted in July of 2014. He pled guilty in – I believe it was August of 2014 to underreporting his income in terms of the variable pay and the $195,000 amounts that he received. He amended his returns in November of 2014 consistent with that plea, where he included that income in his returns. *You know, why the IRS can't [find] returns that he mailed to them I have no idea.*

\*    \*    \*    \*

*So we get a call last week, the IRS says they can't find the returns.* Well, so what [Defendant] does is he goes to his CPA, Mr. Trappio. He gets another copy of the same returns. He – Mr. Trappio signs them, [Defendant] and his wife signs them, and he takes them to Agent L'Heureux and turns them over to him.

*Id.*, pp. 14–15, emphasis added.

At the hearing, the Government presented the following testimony of IRS criminal investigations special agent Cory Joseph L'Heureux:

THE GOVERNMENT: Okay. You've heard assertions by defendant's counsel that the defendant filed amended tax returns in November of 2014.

WITNESS: Correct.

THE GOVERNMENT: Based on those records and based on your own investigation, is there any evidence that the IRS has ever received any tax returns filed by [Defendant] on or about November 2014?

WITNESS: No.

*Id.*, p. 162. In imposing a thirty-six month sentence on Defendant, this Court stated that, "I do not find [Defendant's] testimony credible. I think it reflects that he has not been forthright with the Court, or with the IRS about the African art, or about his income tax returns, and, accordingly, I do not think acceptance of responsibility can be awarded." *Id.*, p. 229.

Defendant subsequently filed a motion for new trial/sentencing, purporting to present new evidence and explanations for damaging evidence and testimony that had been introduced at sentencing. Defendant amended the motion approximately two months later, stating that the IRS had recently found Defendant's amended returns, and that the IRS had received them in November 2014, consistent with Defendant's testimony at sentencing.

This Court initially set the motion for a hearing, but later canceled the hearing and denied the motion for lack of jurisdiction. In denying a new trial/sentencing hearing, the Court noted that,

even if the evidence adduced since the hearing is credited, there is still sufficient evidence to justify [Defendant's] guideline-range sentence. The new information does not fully restore [Defendant's] credibility or meaningfully substantiate his 2005 donation of $500,000 of African art. For the reasons set forth at the sentencing hearing, the Court maintains grave reservations about the legitimacy of that donation.

(Docket Entry No. 68, pp. 7–8.)

The totality of the record fails to support Defendant's argument either as to prosecutorial misconduct or as to harm or prejudice caused by the alleged misconduct. Neither the record nor Defendant's section 2255 motion supports his conclusory argument that the prosecutor knew L'Heureux's testimony was false or misleading as of the sentencing hearing, or that the prosecutor knew his own arguments to the Court were false or misleading at the time they were made. That the IRS later informed the parties at the end of February 2015 that it had found Defendant's amended tax returns filed in November 2014 does not constitute evidence of either perjury or prosecutorial misconduct.

Moreover, and as expressed in the order denying a new trial, Defendant's post-sentencing clarifications and evidence would not have persuaded this Court to impose a lower sentence or grant an acceptance of responsibility adjustment, as they do "not fully restore [Defendant's] credibility or meaningfully substantiate his 2005 donation of $500,000 of African art." Consequently, this Court has already found that Defendant's post-judgment clarifications and evidence were not "reasonably likely" to have resulted in the imposition of a lower sentence in this case.

Nor does the Court accept Defendant's overly-broad contention that the IRS, in its entirety, "was part of the prosecution team" based on the prosecution's use of IRS agent L'Heureux's testimony at sentencing. Defendant argues that the prosecution possessed "imputed knowledge" that the IRS had received Defendant's revised amended returns when L'Heureux presented "contrary, false testimony and arguments" at the sentencing hearing. The Court notes that, in certain instances, "if a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the prosecutors." *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009). A determination of who constitutes a member of the prosecution team is done after a "case-by-case analysis of the extent of interaction and cooperation between the two governments." *Id.* at 308.

However, Defendant's argument here lacks a crucial element: he failed, and fails, to identify through competent evidence, an IRS witness who knew, as of the sentencing hearing, that the IRS had received Defendant's returns in November 2014. Consequently, Defendant did not establish any "imputed knowledge" that the prosecutor had as of the time of the hearing. Indeed, defense counsel told the Court at the hearing that, "So we get a call last week, the IRS says they can't find the returns." Nor was Defendant himself able to produce proof of filing for purposes of the hearing. Taken as a whole, the facts of this case do not warrant holding the prosecution responsible, as of the sentencing hearing, for information IRS agents apparently did not discover until some six weeks after the hearing.

The Government is entitled to dismissal of Defendant's claim for prosecutorial misconduct. Because the Court was able to resolve this issue utilizing the plea and sentencing records and arguments and evidence presented by the parties in their respective pleadings, as supplemented by this Court's personal knowledge, recollection, prior orders, and rulings, an evidentiary hearing on this issue is not required.[2]

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

The United States Supreme Court's decision in *Strickland v. Washington* provides the familiar two-pronged test for establishing a claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687 (1984). In the context of sentencing, the movant must demonstrate a reasonable probability that, but for counsel's errors with respect to sentencing matters, he

---

[2] An evidentiary hearing is required on a section 2255 motion unless the motion, files, and record conclusively show that the prisoner is not entitled to relief. *See* 28 U.S.C. § 2255(b); *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). It is the prisoner's ultimate burden, however, to sustain his claims by a preponderance of the evidence. *United States v. Bondurant*, 689 F.2d 1246, 1251 (5th Cir. 1982). Accordingly, if there is no "independent indicia" of the likely merit of the allegations made in the motion, a hearing is not required. *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006).

would have received less time in prison. *United States v. Grammas*, 376 F.3d 433, 438 (5th Cir. 2004).

Defendant raises the following four grounds for ineffective assistance of counsel:

(1)    Counsel allowed Defendant to persist in claiming the African art deductions in the amended income tax returns and at the sentencing hearing;

(2)    Counsel allowed Defendant to file amended income tax returns without first reviewing them and retaining copies of the signed originals, and he produced the wrong copies to the Government without first reviewing them;

(3)    Counsel allowed Defendant to submit an inadequate acceptance of responsibility letter, and submitted another document that sought to justify Defendant's conduct instead of accepting responsibility; and

(4)    Counsel failed to request a continuance of the sentencing hearing.

Defendant contends that, but for counsel's deficient conduct, he would have received a lower sentence and/or would have been granted an adjustment for acceptance of responsibility.

A.    Acceptance of Responsibility Letter

Defendant claims that counsel was deficient in allowing him to submit an inadequate acceptance of responsibility letter and in submitting a "Purpose of Custodial Account" document that attempted to explain Defendant's conduct. He asserts that, but for counsel's actions, he would have been awarded the acceptance of responsibility adjustment.

In his acceptance of responsibility letter, Defendant wrote the following:

I acknowledge that in 2009 I under reported my income when I filed my income tax return. I exercised an incredible lack of judgment when I did that. I acted irresponsibly by not ensuring that all the taxes were paid in the manner

they should have been. I have worked all my life to develop a good reputation and public image, to try to be someone others could look up to and, by my actions, I have placed a mark on what was previously a good name. I have embarrassed myself and my family. I realize I cannot undo what has been already done but can only attempt to prove to you going forward that this event is not my true character. It is my hope and expectation to be a law abiding citizen in the future, as I was until this event; someone that you and others can be proud of.

(Docket Entry No. 44, p. 12.)

In the PSR and Addendum to the PSR, the probation office stated that, "It appears the defendant has not truthfully admitted the conduct compromising [*sic*] the offense of conviction for which he is accountable under U.S.S.G. § 1B1," *id.*, and that Defendant's letter "does not state he *knowingly and willfully* made a false statement to avoid the payment of taxes, in fact, he minimizes his conduct by stating he had an 'incredible lack of judgment' . . . and that he acted irresponsibly . . ."[.] (Docket Entry No. 45, p. 3, emphasis added.)

At the sentencing hearing, four basic grounds were presented by the Government and probation office for denial of the adjustment: (1) Defendant failed to state in his acceptance of responsibility letter that he "knowingly and willfully" made a false statement to avoid the payment of taxes; (2) Defendant tried to explain if not justify his behavior through the "Purpose of Custodial Account" document; (3) Defendant could not prove up ownership of the purportedly donated African art, and (4) Defendant continued to reflect the improper donation on his November 2014 revised amended tax returns.

At the sentencing hearing and in reference to the acceptance of responsibility issue, the Court stated that, "I'll see what [Defendant] says about the African art. I mean, I think the acceptance of responsibility does include acknowledging whatever the truth is about that." (Docket Entry No. 54, p. 195.) After hearing testimony from witnesses and Defendant's allocution and examining Defendant under oath, this Court denied an acceptance of responsibility adjustment, and stated, "I do not find [Defendant's] testimony credible. I think it reflects that he has not been forthright with the Court, or with the IRS about the African art, or about his income tax returns, and, accordingly, I do not think acceptance of responsibility can be awarded." *Id.*, p. 229.

Contrary to Defendant's contentions here, this Court did not deny the adjustment based on the wording of Defendant's acceptance of responsibility letter or due to the "Purpose of Custodial Account" document. Rather, the Court denied the adjustment based primarily on Defendant's own testimony and what this Court perceived to be his lack of forthrightness. Even assuming counsel were deficient as to the acceptance of responsibility letter or the secondary document, his conduct caused Defendant no actual prejudice. Defendant does not show, and this Court does not find, that but for counsel's alleged deficient performance, Defendant would have received the acceptance of responsibility adjustment and a lower sentence. *See United States v. Wines*, 691 F.3d 599, 604 (5th Cir. 2012) ("To save ink, paper, and time, we will assume without deciding, that Wines' trial

counsel performed deficiently, because even assuming Wines' counsel was ineffective, Wines suffered no prejudice").

Defendant's claim of ineffective assistance premised on an inadequate acceptance of responsibility letter and the filing of the secondary document is without merit, and the Government is entitled to dismissal of the claim. Because the Court was able to resolve this issue utilizing the plea and sentencing records and arguments and evidence presented by the parties in their respective pleadings, as supplemented by this Court's personal knowledge, recollection, prior orders, and rulings, an evidentiary hearing on this issue is not required.

B.    <u>African Art Deductions</u>

Defendant claims that counsel erred in allowing him to persist in claiming the African art deductions in the amended income tax returns and at the sentencing hearing, despite knowing (1) that the Government would oppose acceptance of responsibility if he contested the matter; (2) that he could not prove that he owned the art, donated it to Texas Southern University, and accurately stated the value; but (3) that the Government would agree to acceptance of responsibility and recommend a sentence at the low end of the guideline range if he abandoned the deductions. Defendant contends that, but for counsel's deficient performance, he would have received a lower sentence.

In the Addendum to the Presentence Report, the probation office stated as follows:

In this case, the defendant has not voluntarily withdrawn from criminal tax conduct nor truthfully admitted the conduct comprising the offense of conviction, False Statement on Income Tax Return. . . . Furthermore, by

15

filing amended tax returns in May 2014 for tax years 2009 and 2010 and by filing amended tax returns in November 2014 for tax years 2007 through 2010, *which contain material misrepresentations with regard to fraudulent African Art charitable deductions, the defendant has not voluntarily withdrawn from criminal conduct.*

(Docket Entry No. 45, pp. 2–3, emphasis added.)

In short, it is Defendant's position that, because counsel "allowed" him to continue claiming the African art deductions in his amended tax returns and at sentencing, he did not receive a lower sentence or the acceptance of responsibility adjustment. Defendant made this posture clear at the end of his twenty-one page affidavit:

*Had [counsel] advised me to abandon the African Art deductions* in the amended returns that I filed in May of 2014 and the revised amended returns that I filed in November of 2014 to eliminate this issue from sentencing, to ensure that I would receive acceptance of responsibility, and to hold the Government to its agreement to recommend that I be sentenced at the bottom of the applicable guideline range, *I would have followed that advice.*

(Docket Entry No. 73-1, p. 21, emphasis added.)

In his own affidavit, however, counsel set forth a different version of the events, and stated that, prior to sentencing,

I discussed with [Defendant] removing the African Art deductions from the [November 2014] revised amended returns. I believed that doing so would eliminate the issue from dispute, defuse the Government's rhetoric, and simplify the sentencing hearing. [Defendant] told me that I was "beating a dead horse" and was adamant he would maintain these deductions. [He] did not want to remove the African Art deductions, in part, because doing so would increase his tax liability.

As the date of the sentencing hearing approached, it became clear to me that the primary contested issue at the hearing would be the validity of the African

Art deductions. I told [Defendant] that. He continued to believe that the deductions were valid, so we maintained that position at the sentencing hearing.

(Docket Entry No. 73-2, p. 8.) Counsel further stated that he was not involved in the preparation and filing of the May 2014 amended tax returns, but that he

knew at that time that [Defendant] continued to claim African Art deductions on the amended returns that he filed in May of 2014. It is my recollection that at this stage of the case, when he was under investigation but before he was indicted, the validity of those deductions was not something we understood would be a contested issue.

*Id.*, p. 4. Defendant asserts that counsel became aware as early as July 2014 that the Government was taking issue with the validity of the African art deductions. (Docket Entry No. 73, p. 18.) He further asserts that on October 8, 2014, defense counsel informed him that the deductions "possibly" were going "to make their way into" the PSR. *Id.*

Defendant claims that counsel never made it clear he needed to abandon the African art deductions in order to obtain the desired sentencing recommendations. However, exhibits submitted by Defendant in his pleadings reveal that Defendant's own persistence in claiming the African art deductions continued into November 2014, despite defense counsel's advice to the contrary. In an email to counsel dated November 16, 2014, Defendant informed counsel that

You are beating a dead horse to death. Mark [Trappio] and I have talked about this issue in depth and both believe this is a closed issue. I provided all the appropriate documentation to Kevin Welsh during the audit and he satisfied himself with the authenticity and verifiability of the paperwork. Kevin signed off on these documents and concluded the audit with a

recalculation of the charitable contribution carryover which has been clearly documented on an IRS worksheet. Mark and I also believe the onus of responsibility will be on the Government to discredit Kevin Welsh's documented work. *Although you seem to be uncomfortable with this position, this is the preferred direction I want to take on this issue.*

(Docket Entry No. 73, Exhibit 16, emphasis added). Counsel replied that he thought "this approach [was] a bad idea[.]" *Id.*

In a subsequent email dated November 18, 2014, counsel informed Defendant that his staff was researching the merits of the Government's recommendation that the African art deductions should be considered as relevant conduct. (Docket Entry No. 73, Exhibit 30.) In his response emailed that same day, Defendant suggested that counsel's efforts were misguided "due to a lack of familiarization or working knowledge of the accounting and tax items." *Id.*, Exhibit 31. Defendant berated counsel for his continued work researching the validity and sentencing consequences of the African art deductions:

As an example, I clearly stated that I felt the onus of responsibility would be on the government for the African Art and expected this issue to be closed. Since then, *you have personally continued to expend hours and to assign Erin research efforts on what I considered to be a dead issue.*

*Id.*, emphasis added.

Thus, as late as November 18, 2014, Defendant was refusing to abandon the African art deductions, despite his awareness that the Government would be arguing the deductions constituted "relevant conduct" for sentencing purposes. Defendant provides no probative or persuasive evidence showing that defense counsel "allowed" him to persist in claiming

the African art deductions in the revised amended tax returns and at the sentencing hearing. To the contrary, the exhibits indicate that it was Defendant who instructed counsel to pursue a defensive course that encompassed validity of the African art deductions.

The record shows that counsel specifically told Defendant that failure to abandon the African art deductions would affect whether he might get the acceptance of responsibility adjustment. *Id.*, Exhibit 8. Defendant argues that he understood counsel's use of the word "might" to mean that counsel believed the adjustment remained possible even if the deductions were kept. Defendant states that on January 8, 2015, counsel told him that their defense strategy at sentencing "would be to argue that the African Art deductions were legitimate, based on the evidence that [Defendant] had located, but that, even if [he] had not donated the art to TSU, the deductions did not constitute 'relevant conduct.'" Defendant "deferred to [counsel's] judgment that this was the best strategy to pursue." (Docket Entry No. 73-1, p. 17.)

It is Defendant's position that:

> [counsel] did not tell him during their discussions regarding the plea agreement that he needed to amend his tax returns from previous years to eliminate the African art deductions, or else the Government would assert that he was continuing to engage in intentional, material misrepresentations in violation of the plea agreement that could prevent him from receiving a downward adjustment for acceptance of responsibility. *Had counsel so advised him, he would have abandoned the deductions.*

(Docket Entry No. 73, p. 38, emphasis added.) Defendant contends that, at most, counsel did nothing more than notify him of the Government's belief that the deductions were

fraudulent and that it would argue he was not entitled to an acceptance of responsibility adjustment. (Docket Entry No. 73, p. 48.)

Defendant has proffered evidence sufficient to require an evidentiary hearing as to the *Strickland* "deficient performance" prong of his claim regarding the African art deductions. In particular, the record is unclear as to (1) when, and if, counsel advised Defendant to forgo the African art deductions in order to obtain the Government and probation office's recommendation for the acceptance of responsibility adjustment and low-end sentence, and (2) whether Defendant, having been so advised, persisted in claiming, or having counsel claim, validity of the African art deductions.

The record before the Court is sufficient to allow a determination of the "actual prejudice" prong of *Strickland*, no further testimony or evidence is required as to the issue.

C.    Income Tax Filing

Defendant next claims that counsel erroneously allowed him to file the November 2014 revised amended income tax returns without first reviewing them or retaining copies of the signed originals. He further claims that counsel then produced the wrong copies to the Government without first reviewing them, which enabled the Government to assert at sentencing that Defendant did not file any amended returns in November of 2014 and that he lied when he said that he did. Defendant contends that, but for counsel's deficient performance, he would have received a lower sentence and the adjustment for acceptance of responsibility.

In responding to this claim, defense counsel testified in his affidavit as follows:

> After [Defendant] accepted the plea agreement, [the prosecutor] told me that he believed [Defendant] needed to file revised amended tax returns based on the "variable pay" bonus payments that he had not previously declared. I believed for tactical reasons that [Defendant] should do that.

> \*   \*   \*   \*

> I do not recall when I first learned of Mark Trappio, the individual whom [Defendant] had hired to prepare those amended returns for him in latter 2014. [Defendant] selected Mr. Trappio without any input from me. I remember discussing the "split-dollar life insurance policy" payments and the African Art deductions with Mr. Trappio before the revised amended returns were filed. He believed that the "split-dollar life insurance policy" payments needed to be reported as ordinary income, and he was skeptical about the validity of the African Art deductions. *I was not provided a copy of these amended returns until after [Defendant] had mailed them to the IRS.*

(Docket Entry No. 73-2, pp. 6–7, emphasis added.)

Although Defendant attempts to blame defense counsel for any errors in the November 2014 revised amended returns, counsel states that he was not provided copies of the returns until after they were filed. At no point in his twenty-one page affidavit does Defendant state that he asked counsel to review the returns before they were filed. He instead proffers that it was counsel's constitutional duty to intervene and ask to review the returns before they were filed. The Court disagrees. The record clearly shows that Defendant sought and obtained outside professional tax advice and help in preparing and filing the November 2014 revised amended returns, and that he did not specifically request or rely on counsel's input in the endeavor. Defendant did not seek counsel's review or

approval of the returns before they were filed and, consequently, did not receive counsel's review or approval. No deficient performance is shown under these circumstances, and the Government is entitled to dismissal of this issue.

Nor does this Court find favor with Defendant's further efforts to shift blame in complaining that counsel did not "instruct" him to send the returns by certified mail or to keep signed copies of the returns. Indeed, the sentencing hearing record reflects the Court's astonishment when informed of Defendant's own inactions:

> DEFENSE COUNSEL: They ask – the government asks for a copy of those returns. [Defendant] did not retain a signed copy of the returns which were filed in 2014. So we sent –
>
> THE COURT: That just seems incredible to me.
>
> DEFENSE COUNSEL: Judge, it just – you know, let's face it, we all have different practices and that's his practice, I believe.
>
> THE COURT: But when there's a pending federal prosecution for tax fraud?
>
> DEFENSE COUNSEL: Judge, that's all I can tell you. I mean, if I use that – unfortunately, I don't mean to – I don't mean to downgrade my daughter, but if I use that analysis with my daughter, I'd wonder what the heck she is doing with most of the stuff she's done in her life. So we provide[d] the government with an unsigned copy of the 2007 through 2010 returns that were filed in 20 – in November 2014.

(Docket Entry No. 54, pp. 25–26.)

Defendant's failure to mail his tax returns by certified mail, and his failure to keep signed copies of what he filed, demonstrate poor business practices, not constitutionally deficient lawyering. Defendant all but conceded this point at the sentencing hearing:

> THE COURT: And why is it you didn't save signed copies of those and why is it that the IRS has no record of ever having received those?
>
> THE DEFENDANT: I can't explain why. I can tell you honestly, I took those to the mail – mailbox. The address was provided by Mr. Trappio. I put stamps on them. *I must admit that I was probably negligent in not getting them certified*, but I mailed them, and it's a practice that we have that we – that *the extra copy that was provided by Mr. Trappio was retained in our record file. So my wife and I only signed the original that we mailed.*

(Docket Entry No. 54, p. 217, emphasis added.)

Moreover, Defendant stated in his motion for new trial that the tax preparers he used to prepare the amended tax returns, Russ Miller and Mark Trappio, only provided him with regular pre-addressed envelopes and did not "instruct" him to use certified mail. (Docket Entry No. 55, p. 7.)

Defendant was a successful businessman, well known and respected in the community, with decades of business and finance-related acumen and experience. For him to claim at this juncture that he did not file his tax returns by a receipted means or keep signed copies of what he sent because "defense counsel did not instruct him to do so," is an obvious effort to shield himself from his own failure to exercise good business practices, if not ordinary common sense. No deficient performance is shown under these circumstances, and the Government is entitled to dismissal of this issue.

Defendant further claims that counsel then tendered copies of the wrong tax returns (the "Series B" returns) to the Government without first reviewing them, enabling the Government to argue that no returns were filed and that Defendant was not being truthful. The defense team was unable to account for the two different sets of revised amended tax returns at the sentencing hearing. It was later determined after the hearing that the Series B copies were only drafts, and not final versions, that were inadvertently sent to counsel and the Government. Defendant set forth the following narrative of events in his motion for new trial to show the genesis of the Series B tax return copies:

> [Defendant] acknowledges he forwarded the Series B amended returns to his counsel, who provided them to the Government and the Probation Department. At the time he did that, [Defendant] believed that he was forwarding unsigned copies of the filed returns for those years, just as he had requested he be provided by Mark Trappio, his tax preparer, and did not realize that what he was forwarding was only a draft of those amended returns.

(Docket Entry No. 55, p. 4.) The Government had requested copies of the November 2014 revised amended tax returns, and defense counsel notified Defendant of the request. In response to the request,

> [Defendant] forwarded his counsel the email he had received on November 24th from Mark Trappio which contained, among other attachments, the amended tax returns for 2007 – 2010. See Exhibit I. [Defendant] did this without opening and reviewing these attachments, since (based upon his earlier request to Mr. Trappio) he *believed* these simply to be "soft copies" of the amended returns Mr. Trappio had prepared and given him for filing with the IRS. On their face, these appeared to the 2007 – 2010 amended returns counsel had requested from [Defendant]. Based on that, counsel forwarded

24

those email attachments to the Government and the Probation Department without reviewing them[.]

It was not until the Sentencing Hearing, when the Government introduced the Series B amended returns that [Defendant] or his counsel realized that what they had provided was not what they had thought the documents were. What happened was a simple mistake in communication between [Defendant] and Mr. Trappio which resulted in the Government inadvertently being provided drafts and not the final version of the amended returns filed in November 2014 and re-presented to the IRS in January 2015.

*Id.*, pp. 6–7, original emphasis.

As can be seen, defense counsel requested a copy of Defendant's November 2014 revised amended tax returns to give to the Government. Defendant forwarded to counsel an email from Mr. Trappio, the tax expert who had prepared the tax returns. Defendant believed that the email contained copies of the requested tax returns. Defendant did not check the email attachments before forwarding the email to counsel. Counsel, upon receiving what Defendant informed him were copies of the requested tax returns, forwarded the email on to the Government. Counsel, too, did not check the email attachments before forwarding them. Both Defendant and counsel subsequently learned at the sentencing hearing that the attachments Defendant had forwarded to counsel were drafts of the returns, not the final versions as filed with the IRS.

Given the benefit of hindsight, it is easily argued that counsel should have checked the email attachments before forwarding them to the Government. It is also easily argued that Defendant, given his business and financial expertise, should have checked the email

attachments before forwarding them to counsel. It is not easily argued, however, that counsel was constitutionally deficient in relying on Defendant's assertion that the requested tax returns were attached. Defendant had no apparent reason to question the validity of the attachments from his tax preparer, and counsel had no apparent reason to question the validity of Defendant's statement that the requested tax returns were attached. No deficient performance by defense counsel is shown, and the Government is entitled to dismissal of this issue.

Even assuming counsel were deficient in this regard, Defendant shows no prejudice. *See Wines*, 691 F.3d at 604. Through his post-sentencing motion for new trial, Defendant set forth the above explanation for the Series B copies. Although this Court lacked jurisdiction to grant the motion for new trial, it carefully reviewed Defendant's proffered materials and explanations. The Court emphasized in its order denying a new trial that, "even if the evidence adduced since the hearing is credited, there is still sufficient evidence to justify [Defendant's] guideline-range sentence," in that "[t]he new information does not fully restore [Defendant's] credibility or meaningfully substantiate his 2005 donation of $500,000 of African art. . . . [T]he Court maintains grave reservations about the legitimacy of that donation." (Docket Entry No. 68, pp. 7–8.) Defendant does not show, nor does this Court find, that but for counsel's failure to preview the email attachments from Defendant, there is a reasonable probability that Defendant would have received a lower sentence.

Because the Court was able to resolve this issue utilizing the plea and sentencing records and arguments and evidence presented by the parties in their respective pleadings, as supplemented by this Court's personal knowledge, recollection, prior orders, and rulings, an evidentiary hearing on this issue is not required.

D.    Continuance

At sentencing, the Government argued that Defendant had not filed amended returns in November of 2014, and that copies of returns Defendant provided before the hearing differed from what he claimed to have filed in November of 2014. The following exchange ensued:

> DEFENSE COUNSEL:    Judge, frankly, this is the first I've heard of this issue. I didn't know there was an allegation that what [Defendant] filed in November 2014 was – the amended returns he filed in November 2014 are supposedly different from the amended returns that were given to the IRS last week after they called us and said, We can't find the returns in our system. So I – you know, Mr. Trappio, he –
>
> THE COURT:    Are you claiming unfair surprise then, or –
>
> DEFENSE COUNSEL:    Well, I'm not asking to postpone the sentencing. It is not – this is not an allegation I have previously heard, and I have talked to Mr. Trappio, and it is nothing he has mentioned to me. So I am a little bit mystified by that.

(Docket Entry No. 54, p. 18.)

Defendant asserts that counsel was ineffective in failing to move for a continuance on the basis of unfair surprise. In response to this assertion, defense counsel testified in his affidavit as follows:

27

> During the sentencing hearing, the Government introduced the "Series B" amended tax returns. No one connected with [Defendant's] defense knew where they came from or why they had been created. I noticed that they did not change the bottom-line calculation of the taxes that he owed for the different years. The courtroom was packed with his supporters, *and he did not want to request a postponement of the hearing*; so we proceeded despite being surprised by the "Series B" returns.

(Docket Entry No. 73-2, p. 9, emphasis added.)

To prevail on this claim of ineffective assistance, Defendant must demonstrate under *Strickland* that counsel's performance was deficient and that, but for counsel's failure to move for a continuance, there is a reasonable probability that his sentence would have been less than thirty six months' imprisonment.

Defendant faults counsel for not requesting a continuance so that the genesis of the Series B amended tax return copies could be determined. However, through his post-sentencing motion for new trial, Defendant set forth a cogent explanation for the Series B copies. Although the Court lacked jurisdiction to grant a new trial, it did carefully review Defendant's proffered materials and explanations. The Court emphasized in its order denying a new trial that, "even if the evidence adduced since the hearing is credited, there is still sufficient evidence to justify [Defendant's] guideline-range sentence," in that "[t]he new information does not fully restore [Defendant's] credibility or meaningfully substantiate his 2005 donation of $500,000 of African art. . . . [T]he Court maintains grave reservations about the legitimacy of that donation." (Docket Entry No. 68, pp. 7–8.)

Consequently, the Court has already considered Defendant's explanations for the Series B return copies, and finds that a continuance to obtain and provide such explanations, even had it been requested and granted, would not have lessened the Court's significant concerns about the legitimacy of the 2005 African art donation. *See Wines*, 691 F.3d at 604. Defendant does not show, nor does this Court find, that but for counsel's failure to request a continuance, there is a reasonable probability that Defendant would have received a lower sentence. The Government is entitled to dismissal of this issue.

Because the Court was able to resolve this issue utilizing the plea and sentencing records and arguments and evidence presented by the parties in their respective pleadings, as supplemented by this Court's personal knowledge, recollection, prior orders, and rulings, an evidentiary hearing on this issue is not required.

## VI. CUMULATIVE ERROR

Defendant urges the Court to grant him a new sentencing hearing based on the cumulative effect of prosecutorial misconduct and ineffective assistance of counsel. "Under the cumulative error doctrine, relief may be obtained only when constitutional errors so fatally infect the trial that they violate the trial's fundamental fairness." *United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009) (internal quotation marks omitted). However, errors that did not occur can have no cumulative effect. *United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992).

The Court has rejected Defendant's claim for prosecutorial misconduct and all but one of his claims for ineffective assistance of counsel. Consequently, there is no cumulative error to be addressed, and the Government is entitled to dismissal of this claim.

## VII. UNTIMELY MOTIONS

On April 28, 2017, the Government filed a Supplemental Response, Motion for Summary Judgment on the Pleadings and Supplemental Motion for Summary Judgment and Memorandum in Support (the "Supplemental Response"). (Docket Entry No. 96.) The motion requested summary judgment as to Defendant's prosecutorial misconduct and cumulative error claims. In his expedited response, Defendant objected to the pleading because the deadline to file dispositive motions expired on May 31, 2016, and the Government did not seek leave to file the untimely dispositive motion. Defendant moves to strike the Supplemental Response. (Docket Entry No. 100.) In its response to the motion to strike, the Government set forth a lengthy narrative of personnel changes underway at the Houston Appellate Division Office, culminating with AUSA Turner's statement that, "Unfortunately, AUSA Turner was so focused on the substantive issues and was so intent to file a thorough analysis before the hearing, he neglected to seek leave to file the Supplemental Response." The Government asks the Court to deny the motion to strike and to grant leave to file the Supplemental Response. (Docket Entry No. 101.)

Because the Court has granted the Government's motion to dismiss as to Defendant's claims for prosecutorial misconduct and cumulative error, the Government's Supplemental

Response addressing those same issues is moot. Defendant's motion to strike the Supplemental Response, and the Government's motion for leave to file the pleading, will be denied.

## VIII. UNREDACTED DOCUMENTS

In his section 2255 motion for relief, Defendant attached copies of certain documents with redactions, marked as habeas exhibits 6, 8, 10, 14, 30, and 31. Defendant stated that he redacted information he believed was irrelevant to the disputed issues or was unduly prejudicial. (Docket Entry No. 100, p. 9.)

The Government requests unredacted copies of the documents for its use in preparing for the evidentiary hearing. (Docket Entry No. 96, p. 66.) In his response, Defendant states that he "is not opposed to filing unredacted copies of the specified exhibits under seal with the Court for *in camera* review." (Docket Entry No. 100, p. 10.) Defendant sets forth no objections to the document request nor does he otherwise argue that the Government is not entitled to the unredacted copies. Consequently, Defendant will be ordered to tender the unredacted documents directly to counsel for the Government.

## IX. CONCLUSION

The Court **ORDERS** as follows:

(1)    The Government's motion and supplemental motion to dismiss (Docket Entries No. 85, 86) are **GRANTED** as to Defendant's claims of prosecutorial misconduct and cumulative error, and those claims are **DISMISSED WITH PREJUDICE**.

(2)     The Government's motion and supplemental motion to dismiss (Docket Entries No. 85, 86) are **GRANTED** as to Defendant's second, third, and fourth claims of ineffective assistance of counsel, and those claims are **DISMISSED WITH PREJUDICE**.

(3)     The Court **ORDERS** an evidentiary hearing as to Defendant's first claim of ineffective assistance regarding the African art deductions. The hearing is currently set for 2:00 p.m. on Thursday, May 25, 2017.

(4)     The Government's motion for leave to file the Supplemental Response (Docket Entry No. 101) is **DENIED**.

(5)     Defendant's motion to strike the Government's Supplemental Response (Docket Entry No. 100) is **DENIED AS MOOT**.

(6)     Defendant's motion for *Brady* material relevant to his claim for prosecutorial misconduct (Docket Entry No. 102) is **DENIED AS MOOT**.

(7)     The Government's motion to quash Defendant's subpoena of AUSA Daniel C. Rodriguez as a witness for the evidentiary hearing (Docket Entry No. 103) is **GRANTED**. The sole issue requiring an evidentiary hearing is Defendant's ineffective assistance claim as to the African art deductions, which will involve communications between Defendant and counsel. All other factual aspects of the claim are already of record and need no further development.

(8)     Defendant is **ORDERED** to tender directly to AUSA Daniel C. Rodriguez unredacted copies of Defendant's habeas exhibits 6, 8, 10, 14, 30, and 31. The documents shall be delivered by Defendant's counsel to AUSA Daniel C. Rodriguez, 1000 Louisiana Street, Suite 2300, Houston, TX 77002, by 12:00 noon on Tuesday, May 23, 2017.

Signed at Houston, Texas, on this the 22nd day of May, 2017.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE